**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT NEW MEXICO**

| | |
|---|---|
| THE CINCINNATI INSURANCE COMPANY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   Cause No. |
| | ) |
| DESERT STATE LIFE MANAGEMENT; | ) |
| CHRISTOPHER MOYA, in his capacity as | ) |
| Receiver for the receivership estate of DESERT | ) |
| STATE LIFE MANAGEMENT; PAUL A. | ) |
| DONISTHORPE; CAMERON GRAHAM, as | ) |
| trustee for ANDREW GRAHAM on behalf of | ) |
| himself and all others similarly situated, | ) |
| | ) |
| Defendants. | |

## COMPLAINT FOR DECLARATORY JUDGMENT

COMES NOW, The Cincinnati Insurance Company ("Plaintiff" or "Cincinnati"), and files

this Complaint for Declaratory Judgment against DESERT STATE LIFE MANAGEMENT;

CHRISTOPHER MOYA, in his capacity as Receiver for the receivership estate of DESERT

STATE LIFE MANAGEMENT; PAUL A. DONISTHORPE; and CAMERON GRAHAM, as

trustee for ANDREW GRAHAM on behalf of himself and all others similarly situated;  in support

of which Cincinnati, and alleges as follows:

## NATURE OF THE ACTION

1.      This action arises out of a controversy between the parties regarding Non-Profit

Organization Blue Chip Policy Number BCN-0007591 issued by Cincinnati to Desert State Life

Management, Inc. and in effect for the April 17, 2016 to April 17, 2018 Policy Period (the

"Policy").

2.      Cincinnati brings this action for declaratory judgment pursuant to 28 U.S.C. Section

2201 that the Policy does not cover any Loss and Defense Costs incurred by Desert State Life

Management, Inc. and Paul A. Donisthorpe.

## PARTIES

3.      Plaintiff The Cincinnati Insurance Company is incorporated in the State of Ohio and maintains its principal place of business in Fairfield, Ohio.

4.      Defendant Desert State Life Management, Inc. ("Desert State") is a New Mexico non-profit corporation with its principal place of business in Albuquerque, New Mexico.

5.      Defendant Christopher Moya was appointed as Receiver for the receivership estate of Desert State on August 4, 2017 by Order in the Second Judicial District Court, Bernalillo County, Judge Nan Nash, Case No. D-202-CV-2017-03838. Mr. Moya is the Acting Director of the Financial Institutions Division of the New Mexico Regulation and Licensing Department. As the Receiver for Desert State, Mr. Moya is a real party in interest in this case.

6.      Defendant Paul Donisthorpe is a resident of Bernalillo County, New Mexico. Donisthorpe was, at all relevant times, the Chief Executive Officer and Director for Desert State.

7.      Upon information and belief, Defendant Cameron Graham is a resident of Santa Fe County, New Mexico, and, as trustee for Andrew Graham, is the plaintiff on behalf of himself and all others similarly situated in the lawsuit captioned *Cameron Graham, as trustee for Andrew Graham, on behalf of himself and all others similarly situated v. Desert State Life Management Paul A. Donisthorpe; Helen Bennett, et al.*, Case No. D-202-CV-2018-04655 in the Bernalillo County Second Judicial District Court.

## JURISDICTION

8.      This Court has jurisdiction pursuant to 28 U.S.C. §1332 as there is complete diversity between the parties and the amount in controversy exceeds $75,000 exclusive of interest and costs.

2

9.     Venue is proper in this district pursuant to 28 U.S.C. § 1391, because a substantial part of the events giving rise to this coverage dispute occurred in this judicial district.

## FACTS

### A.     Appointment of the Receiver

10.     Desert State provided trustee and representative payee services to its clients.

11.     On August 4, 2017, the Honorable Nan Nash entered an Order for Declaratory Judgment, Permanent Injunctive Relief, and Granting Application for Appointment of Receiver which appointed Christopher Moya, Acting Director of the New Mexico Financial Institutions Division (the "FID"), as the Receiver for Desert State  ("Receivership Order"). The Receivership Order was entered in the case of in *Financial Institutions Division v. Desert State Life Management, et al.,* which was filed on May 31, 2017 as Case No. D-202-CV-2017-03838, County of Bernalillo Second Judicial District (the "Receivership Complaint" or "Receivership Litigation").

12.     The FID alleged in the verified Receivership Complaint that its investigation and analysis of Desert State's banking and client account records led the FID to believe that over the time period of 2006 through the time of its investigation, more than four million dollars ($4 million) in trust investment account funds managed by Desert State were transferred out of the investment accounts for those trusts and out of the accounts of Desert State and into accounts controlled in whole or in part by Paul Donisthorpe. *See*, Receivership Complaint, ¶63.

### B.     The Information Against and Guilty Plea of Paul Donisthorpe

13.     On November 27, 2017 a Criminal Information was filed against Paul Donisthorpe in the U.S. District Court for the District of New Mexico, captioned *United States of America v. Paul Donisthorpe*, Case No. 17-cr-3311 (the "Criminal Information").

14.    The Criminal Information alleged that from 2006 and continuing through 2016, Donisthorpe, the sole owner and operator of Desert State, knowingly and unlawfully devised a scheme and artifice to defraud by fraudulently extracting and converting approximately $4.8 million of client funds money from Desert State client trust accounts to himself for his own use.

15.    Through the November 27, 2017 Plea Agreement that he signed, Donisthorpe pled guilty to Wire Fraud (18 U.S.C. §1343) and Money Laundering (18 U.S.C. §1957), and made the following admissions of criminal conduct, declaring under penalty of perjury that they are true and correct:

a.    At all times relevant to this statement, I was the chief executive officer and sole owner and operator of Desert State Life Management (DSLM). … I was entrusted to provide trustee services and representative payee services to more than 75 clients. I held the authority and responsibilities of a trustee over the trusts administered by DSLM pursuant to the provisions of the New Mexico Uniform Trust Code, §46A-1-1 NMSA 1978, et seq. The New Mexico Uniform Trust Code, at §46A-8-802 NMSA 1978, mandates a duty of loyalty of trustees and at subsection (1) specifies that a "trustee shall administer the trust solely in the interests of the beneficiaries." (Ex. 1, Plea Agreement, ¶10(a)).

b.    From at least 2009 through 2016, I engaged in a scheme in which I knowingly and intentionally obtained money and property by means of materially false and fraudulent pretenses and representations. Specifically, I transferred client funds from individual client investment accounts, held at financial institutions to include but not limited to Vanguard and Charles

Schwab, to general DSLM accounts. I then transferred the client funds from the DSLM accounts to other non-DSLM accounts I controlled. I then diverted the client funds to other bank accounts, credit card accounts, and mortgages, none of which were associated with DSLM. In this manner, I fraudulently converted more than $3,500,000 of client funds to my own use. (Ex. 1, Plea Agreement, ¶10(b)).

c.    I fraudulently transferred these funds for my own use knowing that I was not entitled to the funds, that the clients had not been informed of the transfers, and that the clients would not have approved of the transfers if they had been informed. I concealed my theft from the clients by causing my accounting staff to falsely record the clients' balances in DSLM accounting records. I presented materially false and fraudulent investment and disbursement reports to the DSLM board of directors, and presented materially false and fraudulent documents including balance sheets and statements to the New Mexico Regulation and Licensing Department—Financial Institutions Division (FID). I provided the materially false and fraudulent documents in order to conceal the fact that I had fraudulently obtained client funds through the scheme described above. (Ex. 1, Plea Agreement, ¶10(c)).

d.    I spent the funds obtained from the scheme described above on personal items including business ventures, my home mortgage, the mortgage for my vacation home in Angel Fire, New Mexico, vehicles, credit card expenditures, and debts to the Internal Revenue Service. (Ex. 1, Plea

Agreement, ¶10(d)).

  e.      I used interstate wire communications facilities for the purpose of carrying

          out the scheme. … (Ex. 1, Plea Agreement, ¶10(e)).

  f.      I conducted numerous monetary transactions involving more than $10,000

          of funds which I knew to be the proceeds of my criminal activity. (Ex. 1,

          Plea Agreement, ¶10(f)).

16.      By signing Plea Agreement, Donisthorpe admitted that there is a factual basis for

each of the crimes to which Donisthorpe pled guilty. (Ex. 1, Plea Agreement, ¶11).

17.      Donisthorpe agreed that, as part of his sentence, the Court will enter an order of

restitution pursuant to the Mandatory Victims Restitution Act, 18 USC §3663A, and agreed to pay

restitution in the total principal amount of $4,812,857, and agreed to the imposition of a money

judgment in the amount of $4,812,857 representing a portion of the net profit Donisthorpe derived

from the criminal offenses. (Ex. 1, Plea Agreement, ¶17-18, 22).

18.      Donisthorpe reasserted the admissions of fact made in his Plea Agreement in his

testimony given under oath at the November 27, 2017 Plea Hearing:

  a.      As stated in that Section 10, I was in fact in charge of a trust company here

          in Albuquerque named Desert State Life Management and was responsible

          for assets of accounts therein. And from the period of rime from 2009 to '16

          I did knowingly and intentionally obtain money and property through

          materially false and fraudulent pretenses and representations, transferring

          these funds to an account that I controlled personally. (Ex. 2, Transcript of

          Proceedings, p. 17:18 – 18:1).

  b.      I basically presented false and materially incorrect investment in

distribution, unfortunately, to these clients, and I do admit that I fraudulently obtained client funds through this scheme. I spent these monies on personal assets, including other business ventures, a home mortgage and other expenditures that had no relation to these accounts. I did use telephone and mailing services to transfer information to investment advisors instructing them to liquidate assets. And I do agree with the amounts in item number 3 there. (Ex. 2, Transcript of Proceedings, p. 18:2-10).

19.     At the November 27, 2017 Plea Hearing, Donisthorpe pled guilty to the felony charge of wire fraud alleged in the Court I of the Information and money laundering alleged in Count II of the Information. (Ex. 2, Transcript of Proceedings, p. 21:13-22).

20.     Donisthorpe's admitted knowingly fraudulent transfer of client funds to his own use constituted the basis for the following lawsuits and demands brought against Desert State, Donisthorpe, and Desert State directors and/or officers, each of which sought damages for losses sustained as a result of the transfer or conversion by Donisthorpe of client funds that were entrusted to Desert State:

      a.     *Ayudando Guardians, Inc. v. Desert State Life Management, Inc., Paul Donisthorpe, individually in his capacities as Chief Executive Offer and Director, L. Helen Bennett, individually in her capacity as director*, Bernalillo County Second Judicial District Court, Case No. D-202-CV-2017-03997 (the "Ayudando Lawsuit").

          i.     Bennett asserted a counterclaim against Donsithorpe in that action, alleging that over the course of years, Donisthorpe embezzled, stole, or converted approximately $4.6 million from funds entrusted to

Desert State for his own use. (Bennett Counterclaim, to Ayudando Lawsuit).

b. *Charles Reynolds, as conservator for J.W., an incapacitated person v. Desert State Life Management, PAUL A. DONISTHORPE, individually and in his capacities as Chief Executive Officer and Director, et al.*, Case No. D-202-CV-2017-04707, Bernalillo County Second Judicial District Court (the "Reynolds Lawsuit").

c. A Complaint in Intervention filed by Joseph A. Perez in the Ayudando Lawsuit. ("Perez Intervention Complaint").

d. A Complaint in Intervention filed by Christine Gallegos, individually and as guardian of Victor Baldizan, in the Ayudando Lawsuit. ("Gallegos Intervention Complaint").

e. A Complaint in Intervention filed by Scott Atkinson, the Court-appointed guardian for Vincent Esquibel, Jr., an incapacitated person, in the Ayudando Lawsuit. ("Atkinson Intervention Complaint").

f. A May 18, 2017 letter sent by Daniel T. Dougherty on behalf of his clients' accounts including the Bellistri Trust; a June 9, 2017 letter sent by F. Michael Hart and Kelly Stout Sanchez on behalf of the Beneficiaries of the Wilkerson M. Howard Irrevocable Trust; and a June 19, 2017 email sent by Michael G. Rosenberg and Jerry Roehl on behalf of Isaac Black (the "Demands").

g. *Cameron Graham, as trustee for Andrew Graham, on behalf of himself and all others similarly situated v. Desert State Life Management Paul A.*

*Donisthorpe; Helen Bennett, et al.*, Case No. D-202-CV-2018-04655 in the Bernalillo County Second Judicial District Court, for a class of all individuals for whom Desert State provided trustee services or representative payee services from January 1, 2009 through December 31, 2016, alleging Donisthorpe stole at least $4.9 million from Desert State clients as admitted in Donisthorpe's Guilty Plea. (The "Graham Class Action Litigation").

h.    The Ayudando Lawsuit, Reynolds Lawsuit, Perez Intervention Complaint, Gallegos Intervention Complaint, and Atkinson Intervention Complaint were consolidated with the Receivership Litigation, and these lawsuits, as consolidated are referred to herein as the "Consolidated Litigation."

i.    On July 24, 2018 the Court entered an Order in the Consolidated Litigation dismissing without prejudice the Complaint and all causes of action or claims which were or could have been asserted by Ayudando Guardians;

ii.    On July 25, 2018, the Court entered an Order in the Consolidated Litigation dismissing without prejudice the Reynolds Complaint, Perez Intervention Complaint, Gallegos Intervention Complaint, and Atkinson Intervention Complaint, and permitting them to pursue their claims through the Graham Class Action Litigation.

## C.    <u>Misrepresentations Made in the Policy Proposal</u>

21.    The Cincinnati Insurance Company Policy that was issued to Desert State was in effect for the Policy Period of April 17, 2016 to April 17, 2018 on which date the Policy was

cancelled. The Policy includes a limit of insurance of $1 million subject to a $25,000 per "claim"

deductible. A certified copy of the Policy, including the Policy Proposal, is attached hereto as

Exhibit 3. A copy of the notice of cancellation is attached hereto as Exhibit 4.

22.    Part I, Directors, Officers, Trustees and Organization Liability Coverage ("Part I"

or "D&O Coverage Part") states as follows:

> In consideration of the payment of the premium, in reliance on all statements in the "proposal" and all other information provided to us and subject to all the provisions of this policy, including the General Declarations, the Part **I** Declarations and the Coverage Part **V** General Provisions, we and the "insureds" agree as set forth below.

23.    "Proposal" is defined in General Provisions Part V. Section XX.K. as follows:

> "Proposal" means:
>
> **1.**    The Application Form for this policy and any applications for any policies for which this policy provides renewal coverage in whole or in part; and
> **2.**    Any materials submitted with the Application Form and such applications, which shall be maintained on file with us and shall be deemed to be attached hereto as if physically attached.

24.    The "Proposal" for the Policy consists of the following:

a.    The "Proposal for Cincinnati's 'Blue Chip' Insurance Program for Non-

Profit Organizations" signed by Paul Donisthorpe, "CEO", on April 16,

2012. (Ex. 3, Policy, bates p. 54-57).

b.    The "Cincinnati Insurance Company Renewal Proposal for Cincinnati's

'Blue Chip' Insurance Program for Non-Profit Organizations", signed by

Paul Donisthorpe, "CEO", on April 12, 2013. (Ex. 3, Policy, bates p. 51-

53).

c.    The "Cincinnati Insurance Company Renewal Proposal for Cincinnati's

'Blue Chip' Insurance Program for Non-Profit Organizations", signed by

Paul Donisthorpe, "CEO", on April 1, 2016. (Ex. 3, Policy, bates p. 48-50).

25.     To induce Cincinnati into issuing the Policy:

   a.     Donsithorpe and Desert State answered question 3(d) of the Proposal, as

   follows:

      3.     Has the Organization or anyone proposed for this insurance been involved in any of the following in the last 3 years. If the answer to any of the questions below is "Yes", please attached complete details.

         d)     Is the Organization aware of any fact, circumstance, or situation which may result in any claim being filed against the Organization, any of its subsidiaries or anyone proposed for this insurance?

         "NO"

   (Ex. 3, Policy, bates p. 54).

   b.     Donisthorpe and Desert State answered the Prior Knowledge/Warranty Declarations as follows:

      2.     No person proposed for this insurance is cognizant of any act, error, or omission which he has reason to suppose might afford valid grounds for any future claim such as would fall within the scope of the proposed insurance, except as follows:

         ☒     None

   (Ex. 3, Policy, bates p. 54).

   c.     Donisthorpe and Desert State did not disclose any fact, circumstance or situation in response to question 4 of the Prior Knowledge/Warranty Declarations and warranted that the statements in the Proposal are true:

      4.     No fact, circumstance or situation indicating the probability of a claim or action against which indemnification would be afforded by the proposed insurance is now known by any person(s) or entity(ies) proposed for this insurance other than that which is disclosed in this Proposal. It is agreed by all concerned that if there be knowledge of any such fact, circumstance, or situation, any claim subsequently emanating therefrom shall be excluded from coverage under the proposed insurance.

> The undersigned authorized agent of the person(s) and entity(ies) proposed for this insurance for the purpose of this Proposal warrants that to the best of his knowledge the statements herein are true and it is agreed that this Proposal shall be the basis of the contract and be deemed incorporated therein should the Insurer evidence its acceptance of this Proposal by issuance of a policy. This Proposal will be attached to and will become part of such policy, if issued.

(Ex. 3, Policy, bates p. 54).

26.    The admissions made in Donisthorpe's Plea Agreement and November 27, 2017 Plea Hearing testimony establish that at the time Donisthorpe signed the Proposal:

    a.    Donisthorpe knew that he had committed criminal acts of wire fraud and money laundering;

    b.    Donisthorpe had knowingly, intentionally and fraudulently transferred, diverted, and converted client funds from individual client investment accounts to his own use;

    c.    Donisthorpe fraudulently transferred client funds for his own use knowing that he was not entitled to the funds, that the clients had not been informed of the transfers, and that the clients would not have approved of the transfers if they had been informed;

    d.    Donisthorpe concealed his theft from Desert State clients by causing his accounting staff to falsely record the clients' balances in Desert State accounting records;

    e.    Donisthorpe presented materially false and fraudulent investment and disbursement reports to the Desert State board of directors, and presented materially false and fraudulent documents including balance sheets and

statements to the New Mexico Regulation and Licensing Department— Financial Institutions Division (FID);

f.    Donsithorpe provided the materially false and fraudulent documents in order to conceal the fact that he had fraudulently obtained client funds through his criminal and fraudulent scheme;

g.    Donisthorpe spent the funds obtained from his scheme on personal items including business ventures, my home mortgage, the mortgage for my vacation home in Angel Fire, New Mexico, vehicles, credit card expenditures, and debts to the Internal Revenue Service;

h.    Donisthorpe used interstate wire communications facilities for the purpose of carrying out his scheme;

i.    Donisthorpe conducted numerous monetary transactions involving more than $10,000 of funds which he knew to be the proceeds of his criminal activity.

27.    The representations made in the Proposal were false and the Proposal contained material nondisclosures since Donisthorpe did not disclose the facts, circumstances, situations, acts, errors, and omissions that he admitted in his Plea Agreement and November 27, 2017 Plea Hearing testimony to have committed and engaged in.

28.    Cincinnati issued the Policy in reliance on the false statements, representations, omissions, and warranties contained in the Proposal.

29.    The false statements, representations, omissions, and warranties contained in the Proposal were material to Cincinnati's acceptance of the risk in issuing the Policy.

30.    If the omissions and falsity of the statements, representations, and warranties had

been disclosed to Cincinnati, Cincinnati (a) would not have issued the Policy; or (b) would not have issued the particular policy that it had issued.

31.    The false statements, representations, omissions, and warranties contained in the Proposal were material to risk of the hazard assumed by Cincinnati.

**D.    Policy Provisions**

32.    Part I – Directors, Officers, Trustees and Organization Liability Coverage, is the only coverage part potentially applicable to the Lawsuits and Demands.

33.    The Policy potentially provides coverage to "claims" first made during "policy period" against an "insured" for a "wrongful act". Part I. Section I. – Insuring Agreement reads as follows:

> We will pay on behalf of the "insureds" all "loss" which they shall be legally obligated to pay resulting from any "claim" first made during the "policy period", or any "extended reporting period" included in or endorsed to the policy, for a "wrongful act".
>
> We will have the right and duty to defend the "insureds" against any such "claim".

(Ex. 3, Policy, bates p. 05).

34.    "Policy period" is defined in Part V. Section XX.H. as follows:

> "Policy period" means the period from the inception date to the expiration date as set forth in Item **2.** of each Coverage Part Declarations, or to the earlier date of cancellation of the applicable Coverage Part.

(Ex. 3, Policy, bates p. 29).

35.    The Policy was cancelled effective April 17, 2018. (Ex. 4, Notice of Cancellation).

36.    Consequently, the "policy period" extends from April 17, 2016 to April 17, 2018.

37.    "Claim" is defined in Part I. Section IV. Paragraph A. as follows:

> "Claim" means:
>
> **1.**    A written demand for monetary damages or non-monetary relief; or

    **2.**      A civil proceeding commenced by fling of a complaint or similar pleading; or

    **3.**      A formal administrative or regulatory proceeding commenced by a filing of charges, formal investigative order or similar document; or

    **4.**      An arbitration, mediation or similar alternative dispute resolution proceeding in which monetary damages are sought if the "insured":

        **a.**      Is required to participate in such proceeding; or

        **b.**      Agrees to participate in such proceeding with our written consent, such consent not to be unreasonably withheld; or

    **5.**      A criminal proceeding commenced by the return of an indictment against;

        **a.**      Any "organization", "subsidiary" or "directors, officers or trustees"; or

        **b.**      Any "employees, volunteers or members". The maximum Limit of Insurance for all such criminal proceedings against any "employees, volunteers or members" in the aggregate shall be **$100,000**. This sublimit shall be part of and not in addition to the Limit of Insurance set forth in Part **I** Declarations and does not increase our maximum liability under this Coverage Part; or

    **6.**      A written request to toll or waive a statute of limitations related to a potential "claim" described in Definitions **A.1** through **A.5.** above;

against any "insured", including any appeal therefrom.

(Ex. 3, Policy, bates p. 06-07).

    38.      "Insured" is defined in Part I. Section IV. Paragraph G. as:

"Insureds" means:

    **1.**      The "organization";

    **2.**      Any "subsidiary";

    **3.**      "Directors, officers and trustees"; and

    **4.**      "Employees, volunteers and members";

including their estates, heirs, legal representatives or assigns in the event of their death, incapacity or bankruptcy.

(Ex. 3, Policy, bates p. 07).

39. "Organization" is defined in Part I. Section IV. Paragraph I. as:

"Organization" means the entity listed as the "Insured Entity" under Item **1.** of the Part **I** Declarations and any such entity in its capacity as a debtor in possession, as such term is used in Chapter 11 of the United States of America Bankruptcy Code, as amended.

(Ex. 3, Policy, bates p. 08). The "Insured Entity" under Item 1. of the Part I Declarations is Desert

State.

40. "Directors, officers or trustee" is defined in Part I. Section IV. Paragraph B. as:

"Directors, officers and trustees" means:

**1.** All persons who were, now are, or shall become a duly elected or appointed director, officer or trustee of the "organization" or a "subsidiary"; and

**2.** The lawful spouse or "domestic partner" of a director, officer or trustee, but only to the extent such person is a party to any "claim" solely in such person's capacity as a spouse or "domestic partner" of a director, officer or trustee of the "organization" or a "subsidiary" and only if the "claim" seeks damages recoverable from marital community property, property jointly held by the director, officer or trustee and the spouse or "domestic partner", or property transferred from the director, officer or trustee to the spouse or "domestic partner".

(Ex. 3, Policy, bates p. 07).

41. "Wrongful act" is defined in Part I. Section IV.M. as follows:

"Wrongful act" means any actual or alleged error, misstatement, misleading statement, act, omission, neglect or breach of duty committed, attempted or allegedly committed or attempted on or after the Retroactive Date, if any, set forth in the Part I Declarations and prior to the end of the "policy period" by:

**1.** Any of the "directors, officers and trustees" or "employees, volunteers and members" in the discharge of their duties solely in their capacity as a director, officer, trustee or employee of the "organization" or any "subsidiary" or member or volunteer of the "organization" or any•

16

"subsidiary" while acting in a voluntary capacity at the direction of the board of directors or board of trustees; or

2. Any of the "directors, officers and trustees" or "employees, volunteers and members" of the "organization" in the discharge of their duties solely in their capacity as a director, officer, governor, trustee or in an executive position equivalent to the foregoing in any "outside organization" if the service is performed at the direction of the "organization" or any "subsidiary or with the consent and knowledge of the "organization" or any "subsidiary"; or

3. Any of the "directors, officers and trustees" or "employees, volunteers and members" solely by reason of their status as such; or

4. The "organization" or any "subsidiary".

(Ex. 3, Policy, bates p. 08).

42.    "Loss" is defined Part I. Section IV.H. of the Policy, as amended by endorsement, as follows:

"Loss" means the total amount of monetary damages which the "insured" becomes legally obligated to pay on account of any "claim" for a 'Wrongful act" with respect to which coverage hereunder applies, including damages, judgments, settlements, prejudgment and postjudgment interest, and punitive or exemplary damages or the multiplied portion of any multiplied damage award if insurable under the applicable law most favorable to the insurability of punitive, exemplary or multiplied damages.

"Loss" shall also include:

Any "excess benefit transaction tax" an "insured" is obligated to pay as a result of a "claim". The maximum Limit of Insurance in the aggregate per each "organizational manager" for any "excess benefit transaction tax' shall be $20,000. This sublimit shall be part of and not in addition to the Limit of Insurance set forth in Part I Declarations and does not increase our maximum aggregate liability under this Coverage Part. The "excess benefit transaction tax" shall not include the 25% excise tax assessed against any "disqualified person" or the 200% tax assessed for failure to correct an "excess benefit transaction".

"Loss" shall not include:

1. Taxes, criminal or civil fines or penalties imposed by law, except as noted above; or

17

**2.** Any restitution, disgorgement or similar sums; or

**3.** Any matter deemed uninsurable under the law pursuant to which this Coverage Part shall be construed.

(Ex. 3, Policy, bates p. 40-41).

43. Coverage under the Policy is subject to the terms, conditions, provisions, and exclusions, which, as set forth at Counts I through IV, bar coverage for Donisthorpe and Desert State.

**E.    Requests for Coverage to Cincinnati**

44. On March 28, 2017 Helen Bennett, a former director of Desert State, sent an email to Cincinnati concerning an allegation that Donisthorpe "had been stealing money from client accounts and using it for his own personal matters." (The "March 28, 2017 Email").

45. Cincinnati treated the March 28, 2017 Email as a notice of "wrongful acts" under Part V. Section V. of the Policy.

46. Following the March 28, 2017 Email, the following lawsuits were submitted to Cincinnati for coverage and defense on behalf of Helen Bennett and Desert State:

      a.    The Ayudando Lawsuit;

      b.    The Reynolds Lawsuit;

      c.    The Perez Intervention Complaint;

      d.    The Gallegos Intervention Complaint;

      e.    The Atkinson Intervention Complaint;

      f.    The Consolidated Litigation;

      g.    The Graham Class Action Litigation.

(The foregoing are collectively referred to herein as the "Lawsuits").

47. Following the March 28 Email, Cincinnati also received the Demands identified in

18

paragraph 20(f), for which Bennett and Desert State sought coverage and defense.

48.    Each of the matters identified in paragraphs 43 and 44 are a "claim" under the Policy.

49.    Pursuant to Part V. Section V., the matters identified in paragraphs 43 and 44 constitute a single "claim" deemed made when the March 28, 2017 Email was sent.

50.    Donisthorpe did not seek coverage for the Ayudando Lawsuit, the Reynolds Lawsuit, the Perez Intervention Complaint, the Gallegos Intervention Complaint, the Atkinson Intervention Complaint, the Consolidated Litigation, and the Demands, and Cincinnati did not defend Donisthorpe with respect to those matters.

51.    Cincinnati defended Desert State against the Ayudando Lawsuit, the Reynolds Lawsuit, the Perez Intervention Complaint, the Gallegos Intervention Complaint, the Atkinson Intervention Complaint, the Consolidated Litigation, and the Demands without waiver of and subject to a reservation of all of its rights, remedies, and defenses.

52.    On July 24 and 25, the Ayudando Lawsuit, the Reynolds Lawsuit, the Perez Intervention Complaint, the Gallegos Intervention Complaint, and the Atkinson Intervention Complaint, filed within the Consolidated Litigation were dismissed without prejudice, and Cincinnati's defense obligations for those lawsuits ceased.

53.    No lawsuit has been filed by the parties on whose behalf the Demands were made.

54.    In September 5, 2018 correspondence to Kevin A. Graham, Senior Enforcement Counsel, New Mexico Financial Institutions Division, and counsel for Christopher Moya, Acting Director of the Financial Institutions Division and Desert State's Court-appointed Receiver, Cincinnati denied coverage to Desert State and Donisthorpe for the Graham Class Action Litigation. Cincinnati also denied coverage to Desert State and Donisthorpe for the Ayudando

Lawsuit, the Reynolds Lawsuit, the Perez Intervention Complaint, the Gallegos Intervention

Complaint, the Atkinson Intervention Complaint, and the Consolidated Litigation, all of which had

been voluntarily dismissed prior to that date, and for the Demands.

55.    Subject to and without waiver of Cincinnati's denial of coverage, the September 5

letter advised Mr. Graham that Cincinnati would agree to defend Desert State for the Graham Class

Action Litigation subject to a full reservation of rights and without prejudice to the withdrawal of

the defense upon a judicial declaration that Cincinnati has no duty to defend or indemnify Desert

State.

56.     Donisthorpe did not seek coverage for the Graham Class Action Litigation and

Cincinnati has not agreed to defend Donisthorpe in that action.

57.    Receiver Moya disputes the denial of coverage and defense.

58.    Cincinnati and Receiver Moya have agreed to waive the Policy's non-binding

mediation requirement set forth in Part V. Section X.A. and all conditions precedent to the filing

of this suit have been met.

### COUNT I
### DECLARATORY JUDGMENT AGAINST ALL DEFENDANTS
### WARRANTY DECLARATION 4 EXCLUSION BARS COVERAGE FOR THE CLAIMS

59.    Cincinnati repeats and realleges the allegations of paragraphs 1 through 58 of this

Complaint as though these paragraphs were set forth in this paragraph 59 of this Count I.

60.    Section VII of the General Provisions states the following with respect to the

Proposal:

**SECTION VII - PROPOSAL**

The "proposal" is the basis of this policy and is incorporated in and constitutes a
part of this policy. It is agreed that the statements in the "proposal" are material and
this policy is issued in reliance upon the truth of such representations. …

(Ex. 3, Policy, bates p. 24).

61.    The Declarations Page states the following with respect to the Proposal:

These Declarations together with the completed "proposal", all applicable Coverage Parts, the General Provisions and any accompanying endorsements shall constitute the contract between the "policy insureds" and The Cincinnati Insurance Company.

(Ex. 3, Policy, bates p. 04).

62.    Paragraph 4 of the PRIOR KNOWLEDGE/WARRANTY DECLARATIONS set forth in the Proposal reads as follows:

No fact, circumstance or situation indicating the probability of a claim or action against which indemnification would be afforded by the proposed insurance is now known by any person(s) or entity(ies) proposed for this insurance other than that which is disclosed in this Proposal. It is agreed by all concerned that if there be knowledge of any such fact, circumstance, or situation, any claim subsequently emanating therefrom shall be excluded from coverage under the proposed insurance.

(Ex. 3, Policy, bates p. 57).

63.    When the Proposal was submitted to Cincinnati, Donisthorpe, the Chief Executive Officer ("CEO") of Desert State, had knowledge of the facts, circumstances, and situations set forth in paragraphs 15 – 19 of this Complaint that indicated the probability of a claim or action against which indemnification would be afforded by the Policy.

64.    The Lawsuits and Demands emanated from the facts, circumstances, and situations set forth in paragraphs 14 – 19 of this Complaint.

65.    By virtue of Paragraph 4 of the PRIOR KNOWLEDGE/WARRANTY DECLARATIONS of the Proposal, no coverage is afforded under the Policy for the Lawsuits and Demands and any other "claim" emanating from the facts, circumstances, and situations admitted by Donisthorpe in the Plea Agreement and the November 27, 2017 Plea Hearing, including, but not limited to, Donisthorpe's transfer or conversion of Desert State client funds.

21

66.    An actual controversy of justiciable nature exists between Cincinnati and the Defendants. Based on the foregoing, Cincinnati seeks a declaration pursuant to 28 U.S.C. 2201 and 2202 that the Policy does not provide coverage for the Lawsuits and Demands, and Cincinnati has no obligation to pay, defend, or indemnify the Lawsuits and Demands and any other "claim" emanating from the facts, circumstances, and situations admitted by Donisthorpe in the Plea Agreement and the November 27, 2017 Plea Hearing, including, but not limited to, the transfer or conversion of Desert State client funds.

## COUNT II

## DECLARATORY JUDGMENT AGAINST ALL DEFENDANTS THAT PART V. SECTION VII. BARS COVERAGE AND DEFENSE

67.    Cincinnati repeats and realleges the allegations of paragraphs 1 through 66 of this Complaint as though these paragraphs were set forth in this paragraph 67 of Count II.

68.    When the Proposal was submitted to Cincinnati, Donisthorpe, the CEO of Desert State, had knowledge of the mispresentations, nondisclosures or the underlying material facts or circumstances which gave rise to the mispresentations and nondisclosures made in the Proposal set forth in paragraphs 14 – 19 of this Complaint.

69.    The misrepresentations and nondisclosures materially affected the acceptability of the risk.

70.    The misrepresentations and nondisclosures materially affected the hazard assumed by Cincinnati.

71.    The Lawsuits and Demands are based upon, arise from or in consequence of the misrepresentations and nondisclosures made in the Proposal.

72.    As he admitted in the Plea Agreement and November 27, 2017 Plea Hearing Testimony, Donisthorpe had knowledge of the misrepresentations and nondisclosures or the

underlying material facts or circumstances which gave rise to the misrepresentations and nondisclosures when the Proposal was signed and submitted to Cincinnati.

73.     Part V. Section VII. bars coverage and defense for the Lawsuit and Demands with respect to Donisthorpe and Desert State and for any "claim" based upon, arising from or in consequence of the misrepresentations and nondisclosures made in the Proposal:

### SECTION VII - PROPOSAL

The "proposal" is the basis of this policy and is incorporated in and constitutes a part of this policy. It is agreed that the statements in the "proposal" are material and this policy is issued in reliance upon the truth of such representations.

In the event that the "proposal" contains any misrepresentation made with the intent to deceive or which materially affects the acceptability of the risk or hazard assumed by us, then no coverage shall be afforded for any "claim" based upon, arising from or in consequence of any such misrepresentation with respect to:

**A.**     Any "directors, officers and trustees", "employees, volunteers and members" or "individual insured" who knew of such misrepresentation or the underlying material facts or circumstances which gave rise to the misrepresentation; or

**B.**     Any "organization", "subsidiary' or "company", if any president, chief executive officer, chief financial officer, or signer of the Application Form of the "proposal" (or any equivalent position to any of the foregoing) knew of such misrepresentation or the underlying material facts or circumstances which gave rise to the misrepresentation.

We shall not be entitled under any circumstances to void or rescind this policy with respect to any "insured".

(Ex. 3, Policy, bates p. 24-25).

74.     Pursuant to Part V. Section IV. Paragraph A. (Policy, bates p. 24), Cincinnati has no duty to defend the Lawsuits and Demands or any other "claim" based upon, arising from or in consequence of the misrepresentations and nondisclosures made in the Proposal:

> We will have the right and duty to defend the "policy insureds" against any "claim"; however, we will have no duty to defend the "policy insureds" against any "claim" to which this insurance does not apply.

(Ex. 3, Policy, bates p. 24).

75. An actual controversy of justiciable nature exists between Cincinnati and the Defendants. Based on the foregoing, Cincinnati seeks a declaration pursuant to 28 U.S.C. 2201 and 2202 that the Policy does not provide coverage for the Lawsuits and Demands, and Cincinnati has no obligation to pay, defend, or indemnify the Lawsuits and Demands and any other "claim" based upon, arising from or in consequence of the misrepresentations and nondisclosures made in the Proposal.

## COUNT III
## DECLARATORY JUDGMENT AGAINST ALL DEFENDANTS THAT THE PRIOR KNOWLEDGE EXCLUSION BARS COVERAGE AND DEFENSE

76. Cincinnati repeats and realleges the allegations of paragraphs 1 through 75 of this Complaint as though these paragraphs were set forth in this paragraph 76 of Count III.

77. The "policy period" for the Part I D&O Coverage Part is April 17, 2016 to April 17, 2019.

78. The Continuity Date identified in Item 7 of the Part I Declarations is April 17, 2012.

79. The Lawsuits and Demands are based upon, arise out of, or in consequence of, or in any way involve "wrongful acts" committed, attempted or allegedly committed or attempted prior to the April 17, 2016 to April 17, 2019 "policy period" of the D&O Coverage Part, which Donisthorpe, the Desert State CEO, knew or should have reasonably foreseen prior to April 17, 2012 might be the basis of a "claim".

80. Pursuant to the Prior Knowledge Exclusion (Part V. Section I. Exclusion E.), Cincinnati has no duty to defend, pay, or indemnify Donsithorpe and Desert State for the Lawsuits

and Demands, and any other "claim" based upon, arising out of, or in consequence of, or in any

way involving any "wrongful acts" admitted by Donisthorpe in the Plea Agreement and at the

November 27, 2017 Plea Hearing:

> We are not liable to pay, indemnify or defend any "claim":
>
> Based upon, arising out of, or in consequence of, or in any way involving any "wrongful act" committed, attempted or allegedly committed or attempted prior to the "policy period" of the applicable Coverage Part if:
>
> 1. Prior to the earlier of the following dates:
>
>    a. The inception of the applicable Coverage Part; or
>
>    b. The inception of the original Coverage Part of which the applicable Coverage Part is a renewal or replacement; or
>
>    c. The Continuity Date, if any, stated in the Declarations for the applicable Coverage Part;
>
>    any of the "named insured's" Executive Director, Chief Financial Officer, President, Chief Executive Officer, Chairman of the Board, In-House General Counsel or person of equivalent position knew or should have reasonably foreseen that such "wrongful act" might be the basis of a "claim"; or
>
> 2. There is a previous policy under which the "policy insureds" are entitled to coverage for such "claim";
>
>                                 * * *
>
> With respect to determining the applicability of the above Exclusions, no "wrongful act" or knowledge possessed by any one of the "policy insureds" shall be imputed to any other "policy insureds" to determine if coverage is available, except for facts pertaining to and knowledge possessed by any past, present or future Executive Director, Chief Financial Officer or Chief Executive Officer of the "organization" or any "subsidiary" shall be imputed to the "organization" or any "subsidiary" to determine if coverage is available.

(Ex. 3, Policy, bates p. 21-22).

      81.    Pursuant to Part V. Section IV. Paragraph A. (Ex. 3, Policy, bates p. 24), Cincinnati

has no duty to defend the Lawsuits and Demands, and any other "claim" based upon, arising out

of, or in consequence of, or in any way involving any "wrongful acts" admitted by Donisthorpe in the Plea Agreement and at the November 27, 2017 Plea Hearing.

82.    An actual controversy of justiciable nature exists between Cincinnati and the Defendants. Based on the foregoing, Cincinnati seeks a declaration pursuant to 28 U.S.C. 2201 and 2202 that the Policy does not provide coverage for the Lawsuits and Demands, that Cincinnati has no obligation to pay, defend, or indemnify the Lawsuits and Demands, and that the Policy does not provide coverage for and Cincinnati has no obligation to pay, defend, or indemnify any other "claim" based upon, arising out of, or in consequence of, or in any way involving any "wrongful acts" admitted by Donisthorpe in the Plea Agreement and at the November 27, 2017 Plea Hearing.

## COUNT IV

## DECLARATORY JUDGMENT AGAINST ALL DEFENDANTS OF NO COVERAGE PURSUANT TO DISHONESTY AND PERSONAL PROFITING EXCLUSIONS

83.    Cincinnati repeats and realleges the allegations of paragraphs 1 through 82 of this Complaint as though these paragraphs were set forth in this paragraph 83 of Count IV.

84.    Part V. Section I. Exclusion C. reads as follows:

We are not liable to pay, indemnify or defend any "claim":

Based upon, arising out of, or in consequence of any of the "policy insureds" or any person for whose actions the "policy insureds" are legally responsible committing any deliberately fraudulent, dishonest, criminal or malicious act or omission or willful violation of any statute, law, rule, regulation, agreement, or judicial or regulatory order, if a final and non-appealable judgment or adjudication adverse to the "policy insureds" establishes a deliberately fraudulent, dishonest, criminal or malicious act or omission or willful violation of any statute, law, rule, regulation, agreement or judicial or regulatory order;

* * *

With respect to determining the applicability of the above Exclusions, no "wrongful act" or knowledge possessed by any one of the "policy insureds" shall be imputed to any other "policy insureds" to determine if coverage is available,

26

except for facts pertaining to and knowledge possessed by any past, present or future Executive Director, Chief Financial Officer or Chief Executive Officer of the "organization" or any "subsidiary" shall be imputed to the "organization" or any "subsidiary" to determine if coverage is available.

(Ex. 3, Policy, bates p. 21-22).

85.    If a final judgment or final adjudication adverse to Donisthorpe establishes a deliberately fraudulent, dishonest, criminal or malicious act or omission or willful violation of any statute, law, rule, regulation, agreement or judicial or regulatory order, Cincinnati is not liable to pay, defend, or indemnify the Lawsuits and Demands pursuant to Part V. Section I. Exclusion C.

86.    Part V. Section I. Exclusion D. reads as follows:

We are not liable to pay, indemnify or defend any "claim":

**D.**    Based upon, arising out of, or in consequence of any of the "policy insureds" or any person for whose actions the "policy insureds" are legally responsible:

  **1.**    Gaining any profit or advantage to which they were not legally entitled; or

  **2.**    For the return by any of the "policy insureds" of any remuneration paid to such "policy insureds" if the payment of such remuneration shall be held by the court to have been in violation of law;

  if a final and non-appealable judgment or adjudication adverse to the "policy insureds" establishes the "policy insureds" gained profit or advantage they were not legally entitled and/or the "policy insureds" are required to return any remuneration held by the court to be in violation of law; provided, however, this exclusion shall not apply to any "claim" under Coverage Part **II;**

* * *

With respect to determining the applicability of the above Exclusions, no "wrongful act" or knowledge possessed by any one of the "policy insureds" shall be imputed to any other "policy insureds" to determine if coverage is available, except for facts pertaining to and knowledge possessed by any past, present or future Executive Director, Chief Financial Officer or Chief Executive Officer of the "organization" or any "subsidiary" shall be imputed to the "organization" or any "subsidiary" to determine if coverage is available.

27

(Ex. 3, Policy, bates p. 21-22).

87.    If a final judgment or final adjudication adverse to Donisthorpe establishes he gained profit or advantage to which he was not legally entitled and/or he is required to return any remuneration held by the court to be in violation of law, Cincinnati is not liable to pay, defend, or indemnify the Lawsuits and Demands pursuant to Part V. Section I. Exclusion D.

WHEREFORE, Cincinnati Insurance Company asks that judgment be entered in its favor and against the Defendants, and prays that this Court:

1.    Determine, decide, adjudicate and declare the rights and liabilities hereto with respect to the Policy  hereinbefore described;

2.    Enter an Order finding and declaring that the Policy does not provide coverage to Donisthorpe and Desert State for the Lawsuits and Demands;

3.    Enter an Order finding and declaring that Cincinnati has no obligation to pay, defend, or indemnify Donisthorpe and Desert State under the Policy for the Lawsuits and Demands;

4.    Enter an Order finding and declaring that Cincinnati has no obligation to pay, defend, or indemnify Donisthorpe and Desert State for any other "claim" emanating from the facts, circumstances, and situations admitted by Donisthorpe in the Plea Agreement and the November 27, 2017 Plea Hearing, including, but not limited to, the transfer or conversion of Desert State client funds.

5.    Enter an Order finding and declaring that Cincinnati has no obligation to pay, defend, or indemnify Donisthorpe and Desert State for any "claim" based upon, arising from or in consequence of the misrepresentations and nondisclosures made in the Proposal.

6.    Enter an Order finding and declaring that the Policy does not provide coverage to

Donisthorpe and Desert State and Cincinnati has no obligation to pay, defend, or indemnify them for any "claim" based upon, arising out of, or in consequence of, or in any way involving any "wrongful acts" committed prior to April 17, 2012 and admitted to by Donisthorpe in the Plea Agreement and at the November 27, 2017 Plea Hearing.

7.      Enter an Order awarding all costs and expenses incurred in this matter, including reasonable attorneys' fees; and

8.      Grant such other and further relief which this Court deems proper.

Dated: October 22, 2018                    Respectfully submitted,


                                           Respectfully submitted,

                                           **SCOTT & KIENZLE, P.A**

                                           /s/ Submitted Electronically 10/22/2018
                                           **PAUL M. KIENZLE III**, N.M. Bar #7592
                                           P.O. Box 587
                                           Albuquerque, NM 87103
                                           505/246-8600; Fax 505/246-8682
                                           paul@kienzlelaw.com


                                           **PETERS & NYE LLP**

                                           By: /s/ Nancy K. Tordai
                                           **NANCY K. TORDAI**
                                           (*pro hac vice* to be applied for)
                                           14 Executive Court, Suite 2
                                           South Barrington, IL  60010
                                           Tel: (847) 423-0353; Fax: (847)381-1693
                                           nancytordai@petersnye.com

                                           *Counsel for The Cincinnati Insurance Company*